We're challenging several issues in the case, most notably sufficiency of the evidence, and I raise that in two elements in my brief, one on the conspiracy count generally, and  the substantive counts generally, and also as to the amount of drugs ascribed to Mr. Akwei based upon his conviction in this case. I think it's fair to say that Mr. Akwei was a late comer to any involvement with any of the criminal activity in this case. As your knowledge, Mr. Akwei was involved in a number of importation schemes from Ghana to the United States, September 2010, November 2010, February 2011, and June 2011. With regard to the September, November, and June importation events, I guess you could say, there's no evidence at all, no suggestion at all that Mr. Akwei knew of, had any part of, had any connection with. There is a little evidence. There was a telephone call with, I can't pronounce his name, Aibu, I guess, and he talked about Mr. Akwei being involved, that he did this, he was my boy, he handled these things, he was important, did errands. Those telephone conversations. Don't they suggest a larger involvement in this overall effort? In this particular case, I don't believe so, and I would state that for a number of reasons. These were telephone conversations mainly between Mr. Aibu and Mr. Ani on February 22nd, the day after Mr. Akwei was arrested. And if you take a look at Mr. Aibu's involvement in the case, first of all, he testified on page 441 of the appendix, that this thing with Emma, Emma Anor, who was the courier of both the November and the February transactions from the people in Ghana, from the, quote, Macaulay organization, that this was his first time. Anor himself explains that he met Aibu only two weeks before the agreement was reached to take what Yobu was involved in to the United States. So anything Yobu talks about to Ani, another confidential informant, I think has to be looked at in that context, that Frank was also a latecomer to whatever scheme was involved here from what was described by the government as the Macaulay organization. I stated 441 for the Yobu statement. With regard to Mr. Anor, Mr. Anor at page 417 of the joint appendix indicated that he had met Yobu on February 18th of 2011. And in fact, I think the explanation by Mr. Anor is that Mr. Frank wanted Yobu, wanted Anor to swallow, to take the drugs to the United States, whereas Anor didn't want to do that, and then a couple weeks later they arranged a different way and they were all happy and he agreed to take it. But that was the first involvement that a latecomer from Ghana and the first involvement by Frank with Mr. Anor, who had been involved in the November transport of drugs to the United States. The conversations with Ani have to be looked on in that context. There's no information that when Yobu talks about an errand that Mr. Akwe had done for him that that had anything to do with drugs. There was never any discussion about that. Yobu was never asked about that. It was part of a telephone conversation. Yobu testified. When he was talking about Akwe in that conversation, he was trying to convince, make a convincing statement as to why Akwe was reliable and you could use him. Well, he could trust him. He knew him for a long time. The evidence was that they had known each other for 10 years in Ghana in the car business. Mr. Yobu was a car salesman. He was a used car salesman. They weren't talking about that, were they, in this conversation? This was a drug deal. Actually, if you look at the questions by the governor, Mr. Yobu, when he first took the stand to testify, they said, well, how do you know Mr. Akwe? Well, I've known him for 10 years. I know him in the car business. I sell used cars and he sells me batteries. I get my batteries from him. That's what Mr. Yobu testifies to. That was in 424 of the joint appendix. He didn't say, well, he's involved in the drug business with me. You have to remember that when Mr. Yobu had... So you think Mr. Akwe was brought in at the last minute into a large drug deal and had no prior involvement with anybody else? I think that's the clear evidence in the case. In fact, when Mr. Yobu was involved in the February 21st transaction of the drugs from Ghana to the United States, the person who was supposed to pick up the drugs was a fellow named Senu. And Mr. Yobu testified that this was the first time he had ever dealt with Senu. But Senu was to pick up the drugs. And Mr. Anur comes to the United States. Frank gives him a number to call. He calls Senu. He calls him throughout the day. They have many conversations throughout the day. And they arrange to meet. And apparently, the guy got cold feet, thought it might be a setup and never showed up to get the drugs. Mr. Yobu doesn't call Mr. Akwe until late in the day or until the afternoon, I think at 3, 4 o'clock in the afternoon. And then Mr. Akwe comes with a friend of his, Joseph Dodu, to meet with Mr. Anur at the hotel in Alexandria. Mr. Akwe lived in Germantown. Mr. Akwe had only lived in the United States a very brief period of time before all this occurred. He didn't move here until August to move in with his wife and family here. But there's no suggestion that Mr. Akwe, other than that conversation, other than what Mr. Yobu was saying in the conversation with Ani, that would put Akwe anywhere else. Does Akwe know Macaulay? Akwe knows Macaulay. And what's the evidence on that? The evidence on that is that there's the... I'm trying to remember. Macaulay was not called to testify. So we don't have the benefit of anything from him. I believe Yobu may have explained at one time that they all knew everybody from similar businesses that they were involved in in Ghana with the car business. I actually don't know whether it found its way into the transcript of the case or in the testament of the case, but Mr. Macaulay owned a car shop of some sort in Ghana. I thought one of your issues on appeal was the error with respect to the introduction of the telephone number. I do raise that because... Doesn't that undercut your argument that... That's the thing. I'm trying to recall whether... I don't think there was any evidence other than the telephone records in the case. I was trying to recall, and I think I might have been recalling things that we knew from outside the record than what was actually on the record. Maybe Mr. Gillis, when he gets up, might be able to answer that with his claptrap mind. I think that the only evidence that was in the record other than what Yobu might have told Ani in the telephone conversation was the telephone call record, with just the absence of any contact, just the name in the phone contact list in the phone book. But getting back to the importance of the evidence in the case, of Yobu's conversations with Ani in the case, there was also a suggestion by Mr.... And don't forget, we're dealing with only the involvement, if you get to that point, of Mr. Akwe in the February 21st incident. Well, I was trying to explore, and I must say, it's sort of difficult to follow the evidence, but I was trying to explore the notion that only the drugs for that February transaction are involved, and obviously, to get over the kilogram, you have to get him involved in another transaction. You have to get him somewhere else, and I think there's an absolute lack of evidence to that. And there is no evidence, I mean, other than that he knows these people, but they're all from the same area. I mean, they know people, and there is just no evidence of any knowledge by Mr. Akwe of anything else having to do with this transaction. Not necessarily this transaction, but there are some other indicia, as I recall, and I'm Mr. Akwe regularly, or at least at some point, ran errands. The only errand that Mr. Yobu testifies to is that at one time he took money to New York for him. It could not have been related to drugs, I don't believe, based upon the late coming of Mr. Yobu to this conspiracy. Well, but that's an inference. I mean, aren't we at the stage in which the jury can draw certain inferences? Well, the jury's entitled to draw inferences from the evidence, but the evidence still has to be substantial enough to be able to support an inference being drawn. You just can't say something and have it happen. You know, the evidence in the case is Yobu meets Emma two weeks before, Emma and Orr, the courier, two weeks before the February 18th, roughly in that time period, that this is the first time Yobu is involved with drugs. That being the case, and so these drugs presumably are the first drugs that Yobu is involved in when he arrives in the United States, or when these drugs arrive in the United States. Any errand that Frank talks about... My recollection of the record is that the government did present evidence that Ackway ran errands, plural, for Yobu, and I understood Mr. Yobu to describe Ackway as what he does is run errands for me. And he planned to direct, to further direct Ackway to take heroin to the person who will sell it. He's explaining, I think, what's in his own mind about what's happening here. I was having Ackway pick this up to take it to a person. Well, the thing is, I don't, none of us really know what was in his mind. And what my question goes to is what a juror could have inferred from the circumstances that were presented, and I think Yobu recorded a statement that Ackway had never done this to me before, which flies in the face of Ackway's, in any argument that this was the first instance of Ackway's running errands for Mr. Yobu. I might be repeating myself, Judge, but it's important that Yobu testified this was his first time. He met Anur two weeks before the February 14th or February 18th transport that arrived here on the 21st, when the arrest was made. Mr. Ackway is called at the last minute. He was not part of this. But, and part of my question was, don't we have a recorded statement that Ackway had never done this to me before? Yobu says that to Mr. Ani. Hard to know whether what he's talking about or whether he's even telling the truth, and Ani acknowledges that. Right. It's also hard to know whether he's telling the truth when he says it's the first time. I mean, that's my only, there is, there doesn't. I understand, but the, I didn't want to cut you off. No, I was just going to say there appears to be at least a contradiction or an inconsistency. There is an inconsistency. There is a contradiction. There's no question about that. But with the short time frame that Mr. Yobu was involved, and the really just maybe. When did Mr. Yobu become involved? When do you allege he became involved? Anwar says that he became involved on February 18th when he agreed to carry the drugs for him to the United States, and that he had met him only two weeks before that. They couldn't come to an agreement because they couldn't agree on the manner in which the transport would be made. And Anwar testified to that again at, I noted it earlier, page 417 of the joint appendix, and where he indicates that he met Frank two weeks before they agreed, and he testified on page 338 of the joint appendix at that meeting, was on page, that the February 18th meeting is on page 338 of the joint appendix. And that's Mr. Anwar's testimony regarding his first contact, the first contacts with Frank Yobu.  Thank you all. Mr. Gillis? Thank you, Your Honor. There was ample evidence that more than one kilogram of heroin was what was in the defendant's mind in connection with this conspiracy, and that it was certainly reasonably foreseeable to him that the conduct of his co-conspirators involved, if not his own conduct, involved more than a kilogram of heroin. First, in this case, there was seized 988 grams of heroin. You need 11.2 more grams. We're working on 11.2 more grams, Your Honor. And in this case, we hear testimony that the defendant had done errands for a Yobu before. And in fact, Anur and Ani, the two cooperating sources, both testified that when, in the case, it was a Yobu's boy or it was Macaulay's boy, meant that he did things for him, that they ran errands for him. And Ani testified specifically that errands in this context meant that he ran drugs. And there really is no other inference to be drawn from those statements that are recorded and that were recorded when a Yobu thought that he was talking to a co-conspirator and not to a cooperating government source. So when a Yobu talked with the courier, he said about the defendant, I know him very well. I know his house. I know everything about him. And then it was in that connection that a Yobu rejected any concern that was being expressed by the courier that the defendant might have taken the heroin and run with it. And on the contrary, a Yobu said, no, no, no. He lives with us here. We sit together and drink. Everybody knows him. Director, everybody. He's one of his boys. In this context, director refers to Macaulay, the kingpin in this heroin conspiracy. Later, after Akwe went missing, there was this concern back in Ghana about what happened to these folks. And so a Yobu recalled another, as it turns out, unluckily for him, another government source whom he also thought was a co-conspirator. And he mentioned... Tony? I beg your... Yes, that's Tony. And he mentioned to Tony that someone who had gone on an errand for him had gone missing. At the record on 620 to 622, Tony testified that that meant that the defendant ran drugs and money for a Yobu. And in fact... Your Honor, may I step to get my glass of water? Excuse me. In fact, there is this recorded conversation between a Yobu and Tony in which he makes clear that these errands are sort of a regular thing. So Tony asks him, how many times have you given him things? And he executes it and returns money for you. And a Yobu clarifies, no, this isn't the guy that sells it. This is... What he does is he runs errand for me. You understand, just like he collected it, I will inform him to take it to the other boy, the boy who will sell it, you understand. Then if it is to collect money, I will send him. He will collect money from that person. And it was clear from that conversation that the defendant had done this on so many frequent occasions that the boy referred to who was to sell the drugs knew where the defendant lived because he had gone there to deliver money. So these statements made by a Yobu to people that he thought at the time co-conspirators clearly were weighed much more heavily than a Yobu's denial on the stand that this was his very first time. In fact, that assertion was baldly untrue. He was a government witness at that point. We had called him, but we don't vouch for the testimony of our witnesses. And in fact, the jury was instructed by the district court, as every jury is instructed, that they're the judges of the credibility of witnesses. And after carefully considering all that they have to say, they may accept some of what they have testified to, all of what they've testified to, or none of it. And clearly in this case, they decided to accept only some of it. Importantly, even without the testimony of a Yobu, there would be plenty of evidence to convict the defendant based solely upon these calls that a Yobu made. So with regard to the weight, it is clear that there were errands involving drugs that took place before this one. And a Yobu tells Tony that he planned to have Akwe, the defendant, take the sample that they had previously talked about to Tony. And Tony testified that they had decided that a Yobu was going to give Tony drugs to sell, or to do with as he pleased, but a Yobu was going to deliver drugs to Tony. And as a taste of what he was going to be getting, a sample, he was going to send to Tony 100 or 200 grams of heroin. So in that regard, Tony's testimony at trial made abundantly clear that that was commonplace and that that was what was being discussed. Is the 100 to 200 grams discussed in the colloquy you're referencing at 620 to 622? Do you recall? If I may, Your Honor. Your Honor, I will endeavor to find it for you. No, that's all right. Thank you. But the 100 to 200 grams was definitely in the testimony of Tony, or Ani, in this case. So, Your Honor, it is not necessary that that future endeavor be ascribed to the defendant, although the jury might have done so. But it's not necessary that they consider what might have been done in the future, because knowing that the defendant had run these errands before, and indeed had, as a Yobu told Tony, had specifically run an errand to him the last time to New York. And even if that last time was merely the delivery of a sample and nothing more, and even if you take the lesser of Tony's estimates for the sample of 100 grams, you're well over a kilogram in this case. This, therefore, is a case completely different from Hickman, where it was necessary to rely upon the diluted weight of the drugs in that case, which involved less than 200 grams, so less than what Tony would have received as a sample. And it was only through analysis by this testifying agent that it would be stepped on down to about 8% that they made this inference that the 170-some-odd grams would be diluted down to the quantity that they were trying to establish was more than a kilogram. Yes, I understood your argument also to be that even if we discounted all this other evidence of errands, which appears to be fairly substantial in the record, that this number by itself, the 989-plus grams, that a jury could fairly extrapolate that it was reasonable that the defendant actually contemplated something larger, some amount over one kilo. Is that your argument? Your Honor, yes. It is exactly our argument that because a drug conspiracy does not require the delivery of even a gram of heroin, what it requires is an agreement to import heroin in this context and distribute heroin. Here, the jury had heard testimony of previous shipments by this conspiracy, that each of which was more than a kilogram. And our argument is that because the amount here was so close to one kilogram, the jury could reasonably have inferred that one kilogram is what the co-conspirators intended that amount to be. And the jury could have inferred that perhaps there was a mismeasurement or miscalculation on the part of the co-conspirators. And so it is not so much whether it was 988 grams or whether it was 1,001 grams. The fact that it's so close to that amount supports an inference that that is what they intended. But to be frank, this was the first drug trial that I had ever done. I had done other kinds of criminal cases before this. And it was only on reading Hickman that I saw this theory that was apparently accepted by the court, that you could take the diluted weight once it was stepped down to a street quantity. So it's notable that in this case the purity of the heroin was 38%, and that had it been cut, as said in Hickman, it would have taken a four in the vernacular that was regarded in that case, which would, of course, put us well over a kilogram and somewhere in the neighborhood of four kilograms. We did not introduce evidence of that kind, so I'm not suggesting that that is a method by which the court could conclude that it's more than a gram. And I don't submit... I think the statute says a kilogram of substance containing the controlled substance. Yes, Your Honor. And it seems to me you would be stuck with whatever dilution was being used, say, with possession of the amount, regardless of how it was diluted. You couldn't project that it could have been diluted for use later. Here, the argument you have to be making, I suppose, is that the anticipation of conspiracy, a distribution of conspiracy, involved a kilogram or more amount, roughly a kilogram amount, because the actual amount, you're stuck with the 988, the actual amount. I will, as I said, we didn't argue it at trial. I do think that the Hickman case, because there weren't diluted quantities, the court began with the assumption that the government's dilution argument was plausible, but what they found was even accepting that dilution argument, it was a mathematical impossibility to reach over a kilogram. Nevertheless, this case, I wouldn't say we're stuck with one kilogram or 988 kilograms because there is abundant evidence that Akwe was involved in this conspiracy through what Ehiobu told these two other... I heard a gram sample was being discussed. Were they talking about a sample of the current shipment? No, sir. It was an earlier sample, earlier transaction. Well, it was an earlier agreement between Ehiobu and Tony that Ehiobu was going to ship him heroin, but as a taste to decide whether to buy the heroin to judge its quality, Ehiobu was going to give 100 to 200 grams to Anit, to Tony, and he told Tony that he was going to have the defendant take that quantity, that sample, to Tony. I submit that the way in which they're talking about these errands that were being run suggests that there was a long history of doing errands between Ehiobu and Akwe, and indeed between Macaulay, the kingpin, and Akwe, the defendant. But, and I would submit that each of those errands the jury certainly could have reasonably inferred involved at least a kilogram of heroin. I'm not suggesting that the only errands that he ran were of that sample quantity size. However... Well, the only reason I raise that is because you only need 12 grams. Yes, Your Honor. And 100 grams clearly would cover the difference to take it over a kilogram. Yes, Your Honor. I am prepared to argue any of the other points that we've addressed in our brief, but unless the court has questions, I would just stand on what we've written. All right, thank you. Thank you, Your Honor. Mr. Stanglow. Thank you, Your Honor. Judge Duncan, I think the appendix reference that you were looking for is page 610 and page 611. I just found it. Thank you very much. And I'm going to start with that. I think in the context of the conversation between Frank and Ani, in that telephone conversation, in referencing the 100 to 200 grams, I think the only logical explanation you can come up with is that that's from the current shipment. There's no evidence that there was any prior shipment. It's also significant that at page... Although, I mean, the wording doesn't, it says a sample, and the sample, it would be an odd sample if it were a part of the actual shipment. I guess I'm not... It's got to get here somehow. In other words, the shipment comes here. There's no other existent sample. Oh, I'm sorry. I just meant in addition to instead of as a part of. I'm not sure that the... The only drugs that we know about that came in on February 21st were the 988 grams. But is this related to February 21st? I would submit that it is, and I'll point out a couple reasons. I think we already talked about when Frank met Anor, who was the actual courier for that instance. But Mr. Aini also says that he was introduced to Frank in early 2011. So we're only talking about January at the earliest. He said possibly late 2010, but he initially said early 2011. So just around that time frame that he has contact with Frank. And apparently, I mean, there's no other evidence that there was ever any other conversation with Aini about Mr. Akwe until after February 21st. So there was those brief conversations on February 22nd. And that's when Mr. Yogo was trying to enlist anybody's help to try to figure out what happened since unknown to him, Mr. Akwe and his friend Mr. Dodo had been arrested on the evening of February 21st. And he doesn't say that he had asked Akwe to do that. He really suggests, I believe, that he was going to do that. But I think the only logical assumption that you can make from that and the only reasonable assumption you can make from that is that this is the only amount of drugs that Frank had in the United States was whatever part he had in or the 988 grams. Frank was supposed to send, you know, me, my friend, a sample of heroin. So Frank was going to send the sample as opposed to somebody taking it from the shipment that was already in the United States. Frank had an interest in the 988. There's no evidence that he had any other drugs here other than what would have been transported. He should be sending it. Pardon me? He should be sending it from Ghana. Then they'd have to do a whole new courier thing. Well, whatever they have, we're talking about the scope of an agreement. The drugs would have had to have been here. If you follow what Mr. Ayobu was saying to Mr. Ani in that telephone conversation, the drugs would already have to be here in order for them to be sent. In order for the drugs to be here. They already had a couple of shipments before. They had the November and September, and maybe they still had drugs left. No evidence that Mr. Ayobu was involved in those transactions, had any interest in those transactions. Mr. Anor, who's the confidential informant, was also the transporter of the drugs in the November incident, and he doesn't meet. He talked to Frank Winkler. No, no, no. Mr. Anor, the. . . Tony. I'm talking about Tony. Oh, no. Tony. . . Really, the conversations we're dealing with with Tony are Frank and Tony on the day after Mr. Akwe's arrest. If Ani was talking to Ayobu on a regular basis, Mr. Akwe's name apparently never came up because nobody ever suggested that there was any conversation about Mr. Akwe prior to February 22nd. And certainly there's no evidence, direct anyway, that Mr. Akwe had any involvement with anything until Frank calls him when the person Frank originally arranged to pick up drugs didn't show up. So I think what I'm trying to suggest is, as we state, is that a jury is able to draw inferences, but they have to be based on substantial evidence and they have to be reasonable inferences. And I don't think when you try to extend to Mr. Akwe knowledge of this greater that anything else was involved, at least in terms of my second argument, anything more than what was there on February 21st. . . These conversations would all seem strangely out of place if this were a single transaction of one kilogram that was going to be just transported by Akwe to some person for sale. In other words, all these conversations, among the others, about the ways of doing business and how we do it, do you know him and he's at the house, I know him, and Aaron's clearly referring to drug errands amounts. I mean, drug assistance, when they explained, especially when Akwe wouldn't get involved in actually selling the drugs but just transporting them. Frank is explaining a lot of things. It's a strange world to have all those conversations taking place if there were a single isolated transaction. Well, I think what Frank was trying to do, and I think Ani recognized that in his testimony, that is, Frank's trying to enlist Ani to help try to figure out what happens. He's not giving a blow-by-blow of a drug conspiracy necessarily. He's just trying to show that he's comfortable, that he knows him, that he asked him to do this and now we can't find him and they need some help doing it. The testimony isn't there, the direct evidence isn't there, it's all from Frank's own mouth about what these things meant. That's one of the handicaps that we have as defense attorneys sometimes is we don't have the access to the witnesses. Yeah, we know where they are, but their lawyers won't let us talk to them. So we've got to be careful about what we ask on the stand. We've got to rely sometimes on the government. Of course, we get the 302s or the 6s and the interview notes and things like that, but when there are things like that that we can't ask, I mean, it's hard for us to ask because we don't know, and we don't know what this man is going to say. But the government didn't ask, and so it leaves a void there. It makes it very difficult sometimes. But I think you have to sort of consider that when you consider whether or not that reasonable inference can be drawn. Thank you very much. I want to recognize your service on behalf of the defendant in this case. It's very important to our system. It makes us credible everywhere. Thank you. I appreciate it. We'll come down and greet counsel and adjourn the court. Signing off.
judges: Paul V. Niemeyer, Allyson K. Duncan, Albert Diaz